## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ROBERT ACEVEDO, : 
                                  :     CIVIL ACTION

         Plaintiff,            :

                                    :

    v.                              :

                                    :     NO. 08-1044

THE CITY OF PHILADELPHIA,      :

                                    :

         Defendant.          :


## MEMORANDUM

RONALD L. BUCKWALTER, S. J.                                 January 21, 2010

       Currently pending before the Court are the Motion for Summary Judgment by Defendant City of Philadelphia (the "City") and the Cross-motion for Summary Judgment by Plaintiff Robert Acevedo. For the following reasons, Defendant's Motion is granted in part and denied in part, and Plaintiff's Motion is denied in its entirety.

## I.     FACTUAL AND PROCEDURAL HISTORY[1]

### A.     <u>General Background of Regulation 32</u>

       This action focuses on the operation of Philadelphia Civil Service Regulation 32 ("Regulation 32" or the "Regulation") and its alleged discriminatory effect on Plaintiff, as well as other individuals with disabilities in violation of the Rehabilitation Act, 29 U.S.C. § 794, *et seq*. Philadelphia City Council passed Regulation 32 in 1953. (Pl.'s Mot. Summ. J., Ex. D, Dep. of Hilary Cornell ("Cornell Dep."), 6:16-23, Aug. 6, 2009.) The Regulation applies to disabled individuals with the purpose of "provid[ing] benefits for . . . all employees in the civil service

---

[1] The statement of facts is compiled from a review of the parties' briefs and the evidence submitted in conjunction with those briefs. To the extent the parties allege a fact that is unsupported by the evidence, the Court does not include it in the recitation of facts.

except, temporary emergency, seasonal, and part-time employees, and those paid at established

hourly rate." (Def.'s Mot. Summ. J., Ex. A ("Regulation 32") §§ 32.011, 32.012.) According to

this Regulation, a "disability" is:

> a physical or mental condition caused by injury or occupational disease, including
> heart and lung ailments, which is service-connected and prevents an employee from
> performing the essential functions of the job classification to which the employee is
> assigned, with or without accommodation. For purposes of this section, disability
> does not include any condition which is self-inflicted or caused by another person for
> reasons personal to the employee and not because of this employment.

(Id. § 32.033.) Once an employee is deemed disabled, he or she is entitled to either seventy-five or

eighty percent of the base salary he/she was being paid on the date of disability (depending on

whether the employee is required to make Social Security contributions). (Id. § 32.023.) For a

police officer injured on duty as either "an immediate result of the violent conduct of a third party

directed towards the officer or a member of the public," or "an immediate result of performing other

heroic action in an emergency situation in the line of duty," Regulation 32 provides that such officer

shall receive 100% of the officer's pre-injury base pay, including longevity. (Id.)

    The Regulation defines the various types of disabilities that it covers. A "partial disability"

is one "which prevents an employee from performing the normal duties of the employee's position,

but which does not prevent the employee from performing the duties of some other position in the

civil service." (Id. § 32.026.) A "total disability" is one "which prevents an employee from

performing any kind of gainful employment." (Id. § 32.0210.) A "permanent disability" is a

"disability determined as not medically correctable and likely to continue for the remainder of the

employee's life." (Id. § 32.027.) Finally, a "temporary disability" is a "disability determined not to

be permanent." (Id. § 32.029.)

    According to Regulation 32, an employee who is "temporarily disabled" "may be continued

in such status for a period not to exceed one year for each work-related injury," unless extended in

six month increments at the recommendation of the Medical Director.  (Id. § 32.045.)  An employee, however, may not be continued in temporary total disability status for more than three years.  (Id.) Similarly, a "permanently and totally disabled" employee shall be compensated at disability salary for at least one year and potentially longer at the recommendation of the Medical Director, but for no longer than three years.  (Id. § 32.0511.)   Finally, and most important for the present case, a "permanently and partially disabled" employee shall be referred for re-employment in a position compatible with his or her disability, skills, abilities, and aptitudes, and shall receive supplemental compensation equaling the difference between the salary rate of the pre-injury position and the salary rate of the secondary position.  (Id. §§ 32.061, 32.06213.)  If a secondary position is not available, either due to the lack of vacancies or the employee's disability, the employee shall be compensated at disability salary for a period of up to six months, which may be extended for up to one year.  (Id. § 32.0642.)

An employee who is separated from his or her position as "permanently and partially disabled" and who seeks to receive his or her pension must apply to the Board of Pensions.  (Cornell Dep. 16:25-18:9.)  Such an employee may not receive both a service-connected disability pension and a workers' compensation pension.  (Id. 18:10-22.)  An employee separated as permanently and either partially or totally disabled forfeits all accumulated sick leave and vacation time.  (Regulation 32 §§ 32.053, 32.0642; Pl.'s Mot. Summ. J., Ex. K, Response to Request for Admissions ("Response to Request") No. 11.)

**B.**      **Administration of Regulation 32**

Wilhelmina Korevaar is the current Medical Director of the Employee Disability Program of Philadelphia.  (Def.'s Mot. Summ. J., Ex. B, Wilhelmina Korevaar Aff. ("Korevaar Aff.") ¶ 1.)  As Medical Director, Dr. Korevaar  is responsible for the review of medical documentation regarding City employees who are participating in the disability programs offered by the City, including

Regulation 32.  (Id. ¶ 2.)  In addition, she bears the initial responsibility for determining whether a City employee sustained a service-connected injury and whether that injury is total or partial and permanent or temporary.  (Cornell Dep. 19:21-20:5; Regulation 32 § 32.031.)

As explained by Dr. Korevaar, the disability determination process begins when she first receives a notice from the employee's health care providers stating that the employee has reached "maximum medical improvement."  (Korevaar Aff. ¶ 3.)  Thereafter, she schedules a meeting with the employee to discuss his or her disability status and she reviews any medical documentation brought by the employees from their own medical providers, as well as medical documentation provided by the City's third-party administrator.  (Id.)  In making her decision, Dr. Korevaar considers the employee's viewpoint, all submitted medical documentation, and the essential functions of the employee's position.  (Id. ¶ 5.)  She does not examine the employee.  (Pl.'s Mot. Summ. J. Ex. K, Response to Request No. 16.)  Both the treating doctor's assessment and the individual employee's assessment are given great weight.  (Pl.'s Mot. Summ. J., Ex. I, Dep. of Wilhelmina Korevaar ("Korevaar Dep.") 33:16-25, 45:4-17, 52:19-53:12, Mar. 17, 2005.)  She has never determined individuals to be permanently and partially disabled if they believed that they could do their pre-injury jobs.  (Id. at 45:10-17.)

In order for an employee to be deemed not disabled, for purposes of Regulation 32, he or she needs to be able to perform all of the essential functions of the job classification to which the employee is assigned.   (Regulation 32 §§  32.022, 32.026; Korevaar Aff. ¶ 5; Cornell Dep. 21:10-22:6.)  To make such a determination, Dr. Korevaar relies on each department's requirements for full, active duty and standard job descriptions.  (Korevaar Dep. 45:18-21.)  Full, active duty refers to particular job classifications, not specific jobs within them.  (Id. at 45:22-25.)  In some more unusual job classifications, Dr. Korevaar contacts the department to understand precisely what a classification encompasses and what opportunities actually exist.  (Id. at 50:7-51:8.)

4

Once the Medical Director makes the initial determination of the nature and extent of disability, either the disabled employee or the appointing authority has the right, within fifteen days after receipt by the employee of written notice of the Medical Director's decision, to ask that a Medical Board review the determination of disability. (Regulation 32 § 32.0312.) The employee may then, at his or her own expense, obtain and present to the Medical Board any medical histories, reports, or testimony. (Id. § 32.0313.) Upon completing a review of the evidence, the Medical Board reports its findings and conclusions to the appointing authority and to the disabled employee or employee's physicians. (Id. § 32.0314.) These findings and conclusions are subject only to appeal to the Civil Service Commission. (Id. §§ 32.0314, 32.12.) Civil Service Commission decisions are then appealable to the Court of Common Pleas of Philadelphia County. 2 Pa. Cons. Stat. § 752 (2008).

If someone is deemed to be "permanently and partially disabled," he or she meets with the Medical Director to discuss various options such as participating in the "secondary employment" program – which is discussed in more detail below – or obtaining a reprieve of an additional few months for the condition to improve. (Cornell Dep. 29:5-30:3.) The "permanently and partially disabled" determination is not a finalization of disability status. (Id. at 29:23-30:3.) The discussion is rather informal and simply explores what the person wants to do and what they believe their medical condition to be. (Id. at 33:22-34:11.) Moreover, the Medical Director and employee may have additional meetings on the subject. (Id. at 35:8-36:7.) If the employee has reached a three-year aggregate or maximum at the time they meet with the Medical Director, however, there are no options available to that employee to remain within City employment other than the "secondary employment" program. (Id. at 34:20-35:4.)

C.    **The Secondary Employment Program**

For employees who are determined to be permanently and partially disabled under

Regulation 32, the City maintains a secondary placement program, which operates to provide "possible re-employment in a position compatible with [the] employee's disability, skills, abilities or aptitudes." (Regulation 32 § 32.061.) The secondary employment program falls under the auspices of the City's Personnel Department ("Central Personnel"), which handles personnel issues for the entire City. (Pl.'s Mot. Summ. J., Ex. K, Response to Request No. 27.) The City's Director of Central Personnel has the responsibility for, among other things, recommending changes to Regulation 32 for consideration by the Philadelphia Civil Service Commission. (Id. Response to Request No. 29.) Secondary employment is available not only to Police Department employees, but to all City employees. (Pl.'s Mot. Summ. J., Ex. E, Dep. of Tahira Jiles ("Jiles Dep."), 8:14-9:3, Aug. 6, 2009.) When individuals enter secondary employment, they are separated from their particular department's payroll and put on the payroll of whatever secondary department they enter. (Id.) Although the individual receives the minimum pay step of the pay range for the new position, the pay for the secondary position is supplemented by the difference between the salary rate of the secondary position and the pre-injury salary rate, provided that as the employee receives pay step increases in the secondary position, the supplementary pay is decreased accordingly. (Regulation 32 §§ 32,0611, 32.06213.) Upon reaching retirement, or at the expiration of one year from the date of disability (whichever is later), supplementary pay shall cease. (Id. § 32.0623.)

Secondary employment is not a guarantee. (Jiles Dep. 11:11-16.) In fact, an employee who is deemed permanently and partially disabled under Regulation 32 will only obtain a secondary employment if a position is available within six months, which may be extended at the discretion of the appointing authority for up to one year. (Id. at 11:17-24; Regulation 32 § 32.0642.) During that six-month window, if the individual cannot be placed either due to his or her physical disability or because of lack of vacancies, he or she shall continue to be compensated at disability salary. (Regulation 32 § 32.0642.) If, at the termination of the maximum one-year period, the individual is

not yet placed in secondary employment, he or she shall be separated from City employment and forfeit all claims or rights to accumulated sick and vacation leave.  (Id.; Jiles Dep. 22:4-9.) Likewise, an individual who refuses the offered secondary position may be separated from the City's employment and lose right to leave time.  (Regulation 32 § 32.0613.)  Once an individual is separated from City employment under these provisions, he or she is placed on workers' compensation benefits and can apply for various types of pensions.  (Jiles Dep. 23:21-24:5.)

  **D.**   **The Philadelphia Police Department and Regulation 32**

  The Philadelphia Police Department ("Police Department") is the fourth largest metropolitan police department in the United States.  (Pl.'s Mot. Summ. J., Ex. K, Response to Request No. 46.) It employs approximately 6,700 sworn officers and 830 civilian employees.  (Id. Response to Request No. 47.)  Sylvester Johnson served as the Police Commissioner for the City from January 4, 2002 until January 7, 2008.  (Id. Response to Request No. 49.)  As the Police Commissioner, Johnson was the final decision maker regarding the making and implementation of polices, practices, and procedures within the Police Department.  (Id. Response to Request No. 50.)

  The Personnel Director of the Police Department at the time relevant to this lawsuit was Lynda Orfanelli.  (Pl.'s Mot. Summ. J., Ex. L; Pl.'s Mot. Summ. J., Ex. G, Dep. Of Albert D'Atlio ("D'Atilio Dep."), 7:13-17, Aug. 21, 2009.)  Further, at the times relevant to this lawsuit, Deputy Commissioner John J. Gaittens oversaw the Bureau of Administration and Training, including the Safety Office and/or Division.  (Pl.'s Mot. Summ. J. Ex. K, Response to Request No. 56.)  Deputy Commissioner Gaittens reports directly to the Police Commissioner.  (Id. Response to Request No. 57.)  Gaittens does not handle any training in matters under the ADA or the Rehabilitation Act. (Pl.'s Mot. Summ. J., Ex. F, Dep. of John Gaittens ("Gaittens Dep."), 13:11-14:20, Aug. 21, 2009.) That responsibility rests with Sergeant Henry Trusch, who works in the Labor Relations Unit and handles all requests for disability accommodation.  (Id. at 14:21-15:21.)

The City uses one job description for each of the positions of police officer, detective, sergeant, corporal, lieutenant, and captain, regardless of the actual job duties which an individual officer performs in a particular job assignment. (Pl.'s Mot. Summ. J. Ex. K, Response to Request No. 72.) The Medical Director refers to these descriptions when making a disability assessment for a police officer. (Cornell Dep. 25:13-26:7.) There are no separate job specifications for officers who are in limited duty capacities. (Pl.'s Mot. Summ. J., Ex. A, Dep. of Carol Madden ("Madden Dep."), 66:23-67:2, Jul. 1, 2009.) Deputy Commissioner Gaittens testified that regardless of where an officer is assigned, he or she is responsible for being able to perform all of the duties as outlined in the job description. (Gaittens Dep. 22:12-22.)

The written job description for a "Police Officer I" states, in relevant part as follows:

GENERAL DEFINITION

This is general duty police work on an assigned shift involving the protection of life and property, enforcement of laws, and investigation of crimes.
Work is performed under the supervision of a police officer of high rank. The employee has a controlling impact on the prevention of crime within an assigned area. Work requires regular exposure to uncontrolled and/or unpredictable conditions and the frequent exercise of moderate physical effort.

TYPICAL EXAMPLES OF WORK (ILLUSTRATIVE ONLY)

Patrols a designated area of the city, on foot or horseback, or in a car[], motorcycle, or police boat to prevent and discover the commission of crime and to enforce traffic and parking regulations; answers calls and complaints, taking the necessary police action.

Takes proper police action at scene of crime, administers first aid, gathers evidence, locates witnesses and makes arrest; appears in court to present evidence and testify against persons accused of crimes.

Investigates persons suspected of being engaged in gambling, illegal sale of liquors, or other vice activities; checks the operation of taverns, poolrooms, dance halls, clubs, and similar establishments for compliance with laws and ordinances.

Ascertains validity of information or secures evidence for the arrest of persons alleged to have committed a crime; searches for and preserves evidence; interviews

suspects, prisoners, complainants, and witnesses to obtain information about crimes; reports automobile accidents, interviews witnesses, takes information, and makes detailed reports.

Investigates complaints concerning juveniles; discusses the case with complainant, juvenile, parents and others who may be able to aid in the case; investigates crimes by and against juveniles; testifies in court concerning case, visits neighborhood boy's clubs and recreations centers, counseling leaders on juvenile problems.

May serve in the district operations office to perform necessary clerical procedures connected with police work.

Performs related work as necessary.

**SKILL IN:**

1.      the use and care of firearms

**ABILITY TO:**

2.      cope with situations firmly, courteously, tactfully and with respect for the rights of others.
3.      analyze situations quickly and objectively, and to determine a proper course of action to be taken.
4.      understand and carry out oral and written instructions.
5.      write and speak effectively.
6.      learn clerical procedures connected with police work.

        REQUIRED KNOWLEDGES, SKILLS AND ABILITIES

**KNOWLEDGE OF:**

•       the use, care and safe handling of firearms.
•       the laws controlling, and the procedures, practices and techniques necessary to police patrol operations.
•       the laws, codes, statutes and regulations concerning criminal activity, especially when they apply to law enforcement operations.
•       the criminal justice system as it applies to law enforcement operations.
•       the techniques, practice and procedures necessary to the effective interaction with the general public, victims, suspects, and officers of other agencies and municipalities.
•       duty manuals, departmental organizations, administrative direction and applicable City ordinances.

* * *

**PHYSICAL AND MEDICAL REQUIREMENTS**

Ability to meet the physical and medical standards approved for this class.

**LICENSES, REGISTRATIONS AND/OR CERTIFICATES**

Possession of a valid proper class motor vehicle operator's license as issued by the Commonwealth of Pennsylvania prior to appointment and during tenure of employment as a Police Officer I.

(Def.'s Mot. Summ. J., Ex. M.)

Expanding on this description, Deputy Commissioner Gaittens noted that all police officers must be able to do the following:  make arrests; take necessary police action to prevent the commission of a crime, including the use of a firearm where needed; and patrol on the street. (Def.'s Mot. Summ. J., Ex. C, John Gaittens Aff. ("Gaittens Aff.") ¶ 24, Sep. 1, 2009.)  Further, Gaittens averred that all officers must obtain a state certification each year showing an ability to carry and use his firearm.  (<u>Id.</u> ¶ 3.)  Without this certification, such an officer cannot carry a firearm and, thus, cannot perform the essential functions of his position.  (<u>Id.</u>) While a police officer need not perform these functions everyday, the police officer position was created for the very purpose of having these essential functions be performed when called upon to do so.  (<u>Id.</u> ¶ 4.)  According to Gaittens, the Police Department has what it calls a "re-call register" for emergency situations. (Gaittens Dep. 25:16-19.)  When a large-scale emergency arises, the Department may cancel days off or put people on twelve-hour shifts.  (<u>Id.</u> at 25:19-27:20; Gaittens Aff. ¶ 5.)  People on limited and restricted duty are then put inside for administrative work to replace the normal full-capacity administrative personnel who are deployed to the street.  (Gaittens Dep. 27:21-29:23.)  In certain particular departments, such as the Narcotics Field Team or City-wide Vice, an all-hands-on-deck

type situation might require every officer to be out in the field at the same time. (Id. at 31:17-32:3.) On the other hand, in departments such as the Gun Permits Unit or Evidence Intake Unit, someone is always available to answer the phone. (Id. at 32:4-14.)

The Police Department's Safety Office and Division falls under the umbrella of the Police Department's Bureau of Administration and Training. (Pl.'s Mot. Summ. J., Ex. K, Response to Request No. 55.) At all times relevant to this lawsuit, Carol Madden, the Police Department's Occupational Safety Administrator, ran the day-to-day operations of the Safety Office. (Id. Response to Request No. 58.) The Safety Office places police officers who have sustained service-connected injuries, but who have not been medically released to fully perform the regular duties of their job classification, in temporary "limited duty" assignments. (Id. Response to Request No. 60; Gaittens Aff. ¶ 2.) The Police Department has always been able to provide a limited duty assignment to an officer who is capable and requests such a position, and itself imposes no restriction on how long a police officer may remain in a limited duty assignment. (Id. Responses to Request Nos. 62-63.) Thus, an officer can remain gainfully employed until the Department has sufficient medical information to determine if the officer can return to full duty. (Gaittens Aff. ¶ 2.) On a day-to-day basis, the Police Department averages approximately 100 officers working in a limited duty capacity. (Gaittens Dep. 16:1-21:2.) Several different units of the Police Department have available limited duty assignments, whereas others do not. Among those that have such available positions include Police Academy, Court Liaison, Evidence Custodian Unit, Traffic Court Liaison, Reports and Control, Differential Response, and Neighborhood Services (or Gun Recovery Reward Information Program). (Madden Dep. 55:11-59:12.) Other units that offer possible, but infrequent or non-routine limited duty placements include building security, crime scene, staff services, detention unit, narcotics, and research and planning. (Id. at 55:11-56:19.) The latter categories usually involve short-term assignments. (Id. at 57:19-58:5.)

11

According to Dr. Korevaar's understanding, when making disability determinations for the Police Department, she relies on the classification for the "police officer" position because, in an emergency, all people classified as police officers, even those who would normally not be on the street, would have to be able to do what a full, active duty, on-the-street officer has to be able to do, including "shoot with both hands accurately, possibly run, jump, and respond to catastrophe in any shape." (Korevaar Dep. 46:6-18.) She was given explicit oral instructions from several Police Department officials that an officer must qualify with both hands before he or she can go back to full active duty. (Id. at 46:20-24, 47:3-50:2.) In short, to be released for full active duty, an officer has to meet all of the above qualifications without consideration of any description of the duties that the individual actually performs (Cornell Dep. 25:20-26:7.)

If Dr. Korevaar finds an officer permanently and partially disabled, she explains to him or her, during their meeting, that she is recommending separation. (Madden Dep. 85:18-87:2.) Although the Medical Director makes the disability determination, it is not final and the officer cannot be terminated until the Police Commissioner approves the determination. (Id. at 84:22-85:13; Pl.'s Mot. Summ. J., Ex. K., Response to Request No. 65.) Once the Police Commissioner signs off on the recommendation, the Safety Officer arranges a separation date with both the Personnel Office and the individual officer. (Madden Dep. 86:10-87:17.) During Police Commissioner Johnson's tenure, he approved the separations of every police officer whom the Medical Director determined could not perform the essential functions of the police officer position. (Pl.'s Mot. Summ. J., Ex. K, Response to Request No. 70.)

**E.    The Application of Regulation 32 to Plaintiff**

Plaintiff Robert Acevedo was hired as a police officer with the Philadelphia Police Department on June 23, 1986. (Id. Response to Request No. 87.) He was separated, pursuant to Regulation 32, on August 27, 2006, after twenty years and two months as a Philadelphia police

officer.  (Id. Responses to Request Nos. 88-89.)

The events leading up to Plaintiff's separation began on June 21, 2004, when Plaintiff, while on-duty and during the course of making an arrest, was physically assaulted by a suspect.  (Id. Response to Request No. 90.)  He sustained a stenar lesion to his right hand, which was, in essence, an injury to a ligament in his right thumb.  (Id.)  As a result, Plaintiff could not carry a weapon or shoot with his right hand, physically restrain a suspect, make arrests, or otherwise patrol.  (Pl.'s Mot. Summ. J., Ex. C, Dep. of Robert Acevedo ("Acevedo Dep."), 18:3-22, 60:5-61:9, Jul. 17, 2009.)  Plaintiff understood that such limitations precluded him from being a regular patrol officer. (Id.)  On June 23, 2004, due to the functional effects of his work injury, the City's medical provider placed Plaintiff in a "limited duty" work status and gave him an assignment at the Police Department's Traffic Unit.  (Id. at 9:22-10:12; 20:3-7; Pl's Mot. Summ. J., Ex. K, Response to Request No. 91.)  His limited duty instructions were set forth in a document dated May 12, 2006. (Def.'s Mot. Summ. J., Ex. D.)

In 2005, there were between 100 and 150 officers in the Traffic Unit, including both full and limited duty officers.  (Pl.'s Mot. Summ. J., Ex. B, Dep. of Corporal Patrice Six-Weigand ("Six-Weigand Dep."), 23:2-16, Jul. 17, 2009.)  Plaintiff was assigned to work under the Operations Room supervisor Corporal Patrice Six-Weigand.  (Id. at 13:23-14:3.)  On a typical day, two active duty officers, plus anyone in limited or restricted duty status – usually two to three officers – would be in the Operations Room.  (Id. at 14:23-15:10.)  Limited or restricted duty officers were given tasks such as answering phones, giving out police radios, and going through paperwork.  (Id. at 16:15-21.)  The duties assigned to such officers were dependent on their capabilities and restrictions as indicated in doctors' notes.  (Id. at 17:3-16.)  Limited or restricted duty officers would perform some of the activities normally performed by active duty officers only if there were limited or no active duty officers in the Operations Room.  (Id. at 43:15-44:3.)  Corporal Six-Weigand, did not

recall Plaintiff performing any of the processing activity or other functions of active duty police officers.  (Id. at 44:4-45:23.)  Plaintiff nonetheless satisfactorily performed his duties in the Traffic Division and, in his February 22, 2006 Performance Review, Corporal Six-Weigand wrote: "Although you have been in injured status, you have adjusted well to working inside and developing new skills.  You are always eager to learn the different aspects of the Operations Room and ready to help your co-workers when needed.  Your work ethic is an asset to the Operations Room."  (Pl.'s Mot. Summ. J., Ex. K, Response to Request No. 95; Six-Weigand Dep., Ex. 1.)  Plaintiff generally got along with others, did everything asked of him, and showed up on time.  (Six-Weigand Dep. 55:5-25.)  It was no burden to keep him in the Operations Room.  (Id. at 62:4-10.)

In spite of Plaintiff's rehabilitative efforts, he did not recover from his injury to an extent that would allow him to resume all of the normal duties of the "police officer" classification in the Philadelphia Police Department.  (Pl.'s Mot. Summ. J., Ex. K, Response to Request No. 102.)  In November 2005, Plaintiff applied for the City's Deferred Retirement Option Plan with a projected retirement date of November 2009.  (Id. Response to Request No. 103.)  On June 22, 2006, after approximately two years of limited duty, Plaintiff was scheduled to meet with Dr. Korevaar to discuss his disability.  (Def.'s Mot. Summ. J., Ex. E.)  Plaintiff, however, failed to appear for his interview on June 28, 2006.  (Def.'s Mot. Summ. J., Ex. F; Korevaar Aff. ¶ 6; Pl.'s Mot. Summ. J. Ex. K, Response to Request No. 107.)  Based on a review of Plaintiff's medical records, Dr. Korevaar diagnosed Plaintiff with "[w]eakness and pain [right] hand (thumb)" that would prevent him from using a firearm, acknowledged Plaintiff's physician's report that he was at maximum medical improvement, and concluded to a reasonable degree of medical certainty that Plaintiff was permanently and partially disabled from returning to his pre-injury duties as a police officer with the City of Philadelphia.  (Def.'s Mot. Summ. J., Exs. F, G.)  She further found, based on the available documentation, that "this permanent and partial disability is due solely to the June 21, 2004 work

injury." (Def.'s Mot. Summ. J., Ex. F.)  Dr. Korevaar believed that Plaintiff could not qualify for

any job in the uniformed service of the Philadelphia Police Department because he no longer had

the ability to shoot with both hands.  (Korevaar Dep. 107:11-19.)

On July 20, 2006, Dr. Korevaar sent Plaintiff a memorandum indicating her medical opinion

that he would never be able to return to his pre-injury position with the City of Philadelphia and that

this determination was the basis for his department to separate him from his employment with the

City.  (Def.'s Mot. Summ. J., Ex. I.)  The memorandum further noted that he would continue to

receive care for his work-related medical condition as long as it was medically required and would

be recommended for a Service Connected Disability Pension.  (Id.)  He was advised both to make an

appointment with someone from personnel to discuss the Secondary Employment Program and to

call the Pension Board to fully understand his pension rights.  (Id.)

On August 25, 2006, Police Commissioner Johnson sent a letter to the Risk Management

Division (which is responsible for administering Regulation 32), stating that he agreed that "if the

medical evidence in the judgment of your Medical Director, precludes return to active duty in the

foreseeable future, in the incumbent classification, the employee should be determined to be

Permanently and Partially Disabled."  (Def.'s Mot. Summ. J., Ex. I.)  He further remarked that the

Police Department was prepared to separate Plaintiff.  (Id.)  By way of additional letter of the same

date, Commissioner Johnson notified Plaintiff that he was deemed permanently and partially

disabled due to his work-related injury of June 21, 2004, and would no longer be able to perform

active police duty.  (Def.'s Mot. Summ. J., Ex. J.)  The letter went on to inform Plaintiff that he

would be separated from the Police Department as of 11:59 p.m. on August 27, 2006, and that the

Board of Pensions and Retirement would make a determination relative to pension benefits.  (Id.)

Finally, Commissioner Johnson sent a third letter to the Board of Pensions and Retirement again

indicating Plaintiff's disabled status and imminent separation from the Police Department.  (Pl's

15

Mot. Summ. J., Ex. K, Response to Request No. 120.) Plaintiff did not exercise his right of appeal to the Civil Service Commission of the decision that he was permanently and partially disabled. (Def.'s Mot. Summ. J., Ex. K.)

### F. Procedural History

Plaintiff filed the present Complaint in this matter on February 29, 2008, against Defendant City of Philadelphia and Police Commissioner Charles Ramsey. The Complaint (1) alleged disability discrimination under section 504 of the Rehabilitation Act, 29 U.S.C. § 794, *et seq.*; (2) claimed that Regulation 32 is facially invalid and/or has a disparate impact on disabled individuals; and (3) asserted that Regulation 32 violated the Due Process Clause of the United States Constitution by failing to provide an adequate interactive procedure. On July 25, 2008, the parties stipulated to dismissal of all claims against Defendant Ramsey. The remaining parties engaged in an extended discovery period and, on September 2, 2009, both parties filed Motions for Summary Judgment.

## II. STANDARD OF REVIEW ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). A factual dispute is "material" only if it might affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). For an issue to be "genuine," a reasonable fact-finder must be able to return a verdict in favor of the non-moving party. Id.

On summary judgment, it is not the court's role to weigh the disputed evidence and decide which is more probative, or to make credibility determinations. Boyle v. County of Allegheny, 139 F.3d 386, 393 (3d Cir. 1998) (citing Petruzzi's IGA Supermarkets, Inc. v. Darling-Del. Co. Inc., 998 F.2d 1224, 1230 (3d Cir. 1993). Rather, the court must consider the evidence, and all reasonable

inferences which may be drawn from it, in the light most favorable to the non-moving party.

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)); Tigg Corp. v. Dow Corning Corp., 822 F.2d 358, 361 (3d Cir. 1987). If a conflict arises between the evidence presented by both sides, the court must accept as true the allegations of the non-moving party, and "all justifiable inferences are to be drawn in his favor." Anderson, 477 U.S. at 255.

Although the moving party bears the initial burden of showing an absence of a genuine issue of material fact, it need not "support its motion with affidavits or other similar materials negating the opponent's claim." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). It can meet its burden by "pointing out . . . that there is an absence of evidence to support the nonmoving party's claims." Id. at 325. Once the movant has carried its initial burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to material facts." Matsushita Elec., 475 U.S. at 586. "There must . . . be sufficient evidence for a jury to return a verdict in favor of the non-moving party; if the evidence is merely colorable or not significantly probative, summary judgment should be granted." Arbruster v. Unisys Corp., 32 F.3d 768, 777 (3d Cir. 1994), abrogated on other grounds, Showalter v. Univ. of Pittsburgh Med. Ctr., 190 F.3d 231 (3d Cir. 1999).

Notably, "[t]he rule is no different where there are cross-motions for summary judgment." Lawrence v. City of Philadelphia, 527 F.3d 299, 310 (3d Cir. 2008). As stated by the Third Circuit, "'[c]ross-motions are no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist.'" Id. (quoting Rains v. Cascade Indus., Inc., 402 F.2d 241, 245 (3d Cir. 1968)).

# III.    DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

The Court turns first to consideration of Defendant City of Philadelphia's Motion for Summary Judgment.[2]  Defendant sets forth five grounds for relief.  First, it claims that Plaintiff cannot succeed on his claims for disability discrimination in Counts I and II of the Complaint because he is not a qualified individual and cannot perform the essential functions of a police officer with or without accommodation.  Second, it asserts that Plaintiff lacks standing to bring a claim for a facial violation of the Rehabilitation Act.  Third, Defendant avers that Plaintiff's disparate impact claim must fail on its merits.  Fourth, Defendant argues that Plaintiff has come forward with no evidence to prove a disparate impact violation.  Finally, Defendant alleges that Plaintiff's due process claim is meritless because the procedures provided were adequate and, in any event, Plaintiff failed to take advantage of those procedures.  The Court considers each argument individually.

### A.    Whether Plaintiff Is a "Qualified Individual" for Purposes of Disability Discrimination

As set forth above, Counts I and II allege disability discrimination and intentional discrimination respectively under § 504 of the Rehabilitation Act, 29 U.S.C. § 794, *et seq.* "Congress passed the Rehabilitation Act in 1973 to make certain that no individual with a disability would 'be subjected to discrimination under any program or activity receiving Federal financial assistance.'"  Fowler v. UPMC Shadyside, 578 F.3d 203, 206-07 (3d Cir. 2009) (quoting 29 U.S.C. § 794(a)).  Plaintiffs alleging violations of § 504 have a private right of action under federal law.  Id. at 206-07 n.2.  To make out a prima facie case of discrimination under the Rehabilitation Act, the employee bears the burden of demonstrating:  "'(1) that he or she has a disability, (2) that he or she

---

[2]  Although the Court separately addresses both Motions for Summary Judgment, we will consider the arguments raised in Plaintiff's Motion and accompanying briefs when ruling on Defendant's Motion, and vice versa.

is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) that he or she was nonetheless terminated or otherwise prevented from performing the job." Donahue v. Consol. Rail Co., 224 F.3d 226, 229 (3d Cir. 2000) (quoting Shiring v. Runyon, 90 F.3d 827, 831 (3d Cir. 1996)). "The plaintiff must make a prima facie showing that reasonable accommodation is possible." Id. Once the plaintiff makes these requisite showings, the burden shifts to the defendant to prove "'as an affirmative defense, that the accommodations requested by the plaintiff are unreasonable or would cause an undue hardship on the employer.'" Id. (quoting Shiring, 90 F.3d at 831).

Defendant does not dispute that Plaintiff was, at all relevant times, a person with a disability or that Plaintiff was terminated because of his disability. Rather, it focuses its Motion on the argument that Plaintiff was not "otherwise qualified" because he could not perform the essential functions of his job as a police officer. The ADA[3] defines "qualified individual with a disability," in relevant part, as "an individual with a disability who, with or without reasonable modifications to rules, policies, or practices . . . or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2); see also Bowers v. Nat'l Collegiate Athletic

---

[3] By the express terms of the Rehabilitation Act,

> [t]he standards used to determine whether this section has been violated in a complaint alleging employment discrimination under this section shall be the standards applied under title I of the Americans with Disabilities Act of 1990 ["ADA"] (42 U.S.C. 12111 et seq.) and the provisions of sections 501 through 504, and 510, of the Americans with Disabilities Act of 1990 (42 U.S.C. 12201-12204 and 12210), as such sections relate to employment.

29 U.S.C. § 794(d). Accordingly, the standards for assessing a violation of § 794(d) are "coextensive with the standards for determining whether a covered employer has violated the ADA." Fowler, 578 F.3d at 208.

Ass'n, 118 F. Supp. 2d 494, 511 (D.N.J. 2000) ("An individual is a 'qualified individual' if that individual can meet essential requirements with or without reasonable modification."). A two-part test is used to determine whether someone is "a qualified individual with a disability." First, a court must consider whether "'the individual satisfies the prerequisites for the position, such as possessing the appropriate educational background, employment experience, skills, licenses, etc.'" Gaul v. Lucent Techs., Inc., 134 F.3d 576, 580 (3d Cir. 1998) (quoting 29 C.F.R. pt. 1630, App. at 353-54). Second, the court must determine "'whether or not the individual can perform the essential functions of the position held or desired, with or without reasonable accommodation.'" Id. (quoting 29 C.F.R. pt. 1630, App. at 353). Under the Rehabilitation Act, "[a] handicapped individual who cannot meet all of the program's requirements is not otherwise qualified if there is a factual basis in the record reasonably demonstrating that accommodating that individual would require either a modification of the essential nature of the program, or impose an undue burden on the recipient of federal funds." Strathie v. Dept. of Transp., 716 F.2d 227, 231 (3d Cir. 1983). "The determination of whether an individual with a disability is qualified is made at the time of the employment decision," id. (quoting 29 C.F.R. pt. 1630, App. at 353-54), and is inherently a question of fact. Wilson v. Pa. State Police Dept., 964 F. Supp. 898, 912 (E.D. Pa. 1997) (citing Sch. Bd. of Nassau County v. Arline, 480 U.S. 273, 287 (1986)).

In the present case, the parties agree that Plaintiff has the requisite education, experience, skills, and licenses for being a police officer. The parties, however, dispute whether Plaintiff could perform the essential functions of the prior position with or without reasonable accommodation. That dispute again raises two separate questions. First, the Court must determine what the essential functions of a "police officer" were at the time in question. Second, the Court must inquire as to whether Plaintiff could perform all of those functions with or without reasonable accommodation. See Luckiewicz v. Potter, ___ F. Supp. 2d ___, 2009 WL 4043077, at *5-7 (E.D. Pa. Nov. 20, 2009)

(describing the two-part inquiry); <u>Strawbridge v. Potter</u>, No. CIV.A.08-2937, 2009 WL 2208577, at *9-10 (E.D. Pa. Jul. 22, 2009). Because a genuine issue of material fact exists as to the first of these inquiries, the Court focuses the discussion solely on that question.

The ADA provides that "[t]he term essential functions means the fundamental job duties of the employment position the individual with a disability holds or desires. The term 'essential functions' does not include the marginal functions of the position." 29 C.F.R. § 1630.2(n)(1). A job function may be considered "essential" for any of a number of reasons, including but not limited to the following:

> (i) The function may be essential because the reason the position exists is to perform that function;
>
> (ii) The function may be essential because of the limited number of employees available among whom the performance of that job function can be distributed; and/or
>
> (iii) The function may be highly specialized so that the incumbent in the position is hired for his or her expertise or ability to perform the particular function.

29 C.F.R. § 1630.2(n)(2).

A reviewing court attempting to define what the essential functions of a particular job are must consider "the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, the description shall be considered evidence of the essential functions of the job." 42 U.S.C. § 12111(8). In addition, the applicable regulations provide a non-exclusive list of what evidence should be considered in determining whether a particular function is essential:

| | |
|---|---|
| (i) | The employer's judgment as to which functions are essential; |
| (ii) | Written job descriptions prepared before advertising or interviewing applicants for the job; |
| (iii) | The amount of time spent on the job performing the function; |
| (iv) | The consequences of not requiring the incumbent to perform the function; |

(v) The terms of a collective bargaining agreement;
(vi) The work experience of past incumbents in the job; and/or
(vii) The current work experience of incumbents in similar jobs.

29 C.F.R. § 1630.2(3). Notably, "[b]y categorizing a 'written description' provided by an employer as *evidence* of what the essential functions of a job are, Congress clearly did not intend for an employer's characterization of a job 'requirement' as an 'essential function' to be conclusive." Tish v. Magee Women's Hosp. of Univ. of Pittsburgh Med. Ctr., No. CIV.A.06-820, 2008 WL 4790733, at *14 (W.D. Pa. Oct. 27, 2008). Indeed, "[w]hile an employer is free to craft requirements for the positions that it creates, it is not free to avoid the strictures of the ADA or the Rehabilitation Act by simply characterizing all 'requirements' as 'essential functions.'" Id. (citing Johnson v. McGraw-Hill Cos., 451 F. Supp. 2d 681, 704 (W.D. Pa. 2006)). A distinction must be made between the requirements of a given position and the essential functions of that position. Conneen v. MBNA Am. Bank, N.A., 334 F.3d 318, 329 (3d Cir. 2003). As is apparent, however, "'[w]hether a particular function is essential is a factual determination that must be made on a case by case basis.'" Skerski v. Time Warner Cable Co., a Div. of Time Warner Entm't Co., L.P., 257 F.3d 273, 279 (3d Cir. 2001) (quoting EEOC Interpretive Guidance on Title I of the Americans with Disabilities Act, 29 C.F.R. pt. 1630, App. 1630.2(n) (2000)). "It follows that none of the factors nor any of the evidentiary examples alone are necessarily dispositive." Id.

Defendant puts forth two primary pieces of evidence to support its position that the tasks of patrolling, apprehension of suspects, and use of a firearm are "essential functions" of a police officer with the City of Philadelphia. First, it points to the "Typical Examples of Work" in the written description of a the police officer position, which references patrolling and making arrests. (Def.'s Mot. Summ. J., Ex. M.) Second, Defendant points to the affidavit of Deputy Commissioner Gaittens, who avers that in order to work as a police officer, an individual must obtain a state certification demonstrating that he has the ability to carry and use his firearm. (Gaittens Aff. ¶ 3.)

Gaittens goes on to list the essential functions of a police officer as follows:  the ability to make arrests; the ability to take necessary police action to prevent the commission of a crime, including use of a firearm where needed; the ability to be on patrol on the street; and the ability to respond to emergency situations when called upon to do so.  (Id. ¶¶ 4-5.)  Although a police officer need not perform these essential functions every day, Gaittens notes that the police officer position was created for the very purpose of having these functions performed when necessary.  (Id.)

In response, Plaintiff offers three arguments to bolster his contrary position that such functions are not essential to all Philadelphia police officer positions.  First, he contends that the written description contradicts Gaittens's representations as to the "essential functions" of a police officer position, and neither designates any particular physical requirements nor requires a state firearm certification.  Second, Plaintiff argues that the Philadelphia Police Department contains literally hundreds of positions that do not entail regular patrol duties, thereby making it a falsity for the Police Department to singularly classify the "police officer" position without individualized job functions set out for the different jobs within the Department.  Finally, Plaintiff contends that the fact that the City continued to employ him as a police officer for two years after he was injured and unable to obtain a weapons certification from the state demonstrates that such a certification is not an "essential function of the job."

As to Plaintiff's third point –  that he worked successfully in a limited duty position for two years – courts have held that the mere fact that a plaintiff is able to perform the  responsibilities of a limited duty position, even over an extended period, does not make that plaintiff a "qualified individual" under the Rehabilitation Act.  Luckiewicz, 2009 WL 4043077, at *6.  Under the Act, an employer need not create positions specifically for the handicapped employee.  Shiring, 90 F.3d at 831 (citing Fedro v. Reno, 21 F.3d 1391, 1395 (7th Cir. 1994)).  Thus, the fact that Plaintiff worked at a light duty position for two years in which he was not required to carry a firearm does not bear

on whether or not the carrying of a firearm is an "essential function" of a police officer position.[4] Nor must the Court consider an otherwise non-existent position as an accommodation that would make Plaintiff qualified.

Plaintiff's first two proffers of evidence, however, give this Court greater pause. As to the written description, Plaintiff accurately notes that, despite a whole section of that document dedicated to the physical and medical requirements, nothing indicates that a police officer must be required to make arrests, shoot a gun, or apprehend a suspect. An officer need only have the ability to engage in "the frequent exercise of moderate physical effort." (Def.'s Mot. Summ. J., Ex. M.) Moreover, under the heading, "Licenses, registrations and/or certifications," the only enumerated requirement is a motor vehicle operator's license, with no reference to a firearm certification. (Id.) Although the section entitled "Typical Examples of Work" lists patrolling, making arrests, and investigations, that section does not suggest that these are "essential functions." Quite to the contrary, the section is specifically labeled "Illustrative Only," meaning that these examples of work are not meant to constitute essential duties. (Id.) In addition, the section lists a host of other possible, non-physical tasks such as performing necessary clerical procedures, counseling juveniles, interviewing suspects, and reporting automobile accidents, none of which Defendant claims to be essential. (Id.) The fact thus remains that the document does not contain any mention of requirements equivalent to those deemed essential by Defendant. As the applicable regulations under the Rehabilitation Act specifically direct consideration of a written description, 29 C.F.R. § 1630.2(n)(3), the Court must find that this document calls into doubt Defendant's definition of the

---

[4] Plaintiff cites to the testimony of his supervisor, Corporal Patrice Six-Weigand, in which she indicated that an officer working inside on limited duty is not required to carry a weapon. (Pl.'s Resp. Def.'s Mot. Summ. J. 5 (citing Six-Weigand Dep. 56:10-16).) As indicated above, however, the functions of a limited duty position are not probative of the essential functions of the full-duty position for which the plaintiff was hired.

essential functions of a police officer position.

As to Plaintiff's contention that there are hundreds of positions performed by active duty officers that require no such physical abilities, this Court finds that this argument likewise creates a genuine issue of material fact. The Court recognizes that uniform physical capacity requirements for job classifications have been upheld, "even where the actual need for the worker to perform the required task was infrequent or remote." Sturm v. UAL Corp., No. CIV.A.98-264, 2000 WL 1300396, at *14 (D.N.J. Sep. 5, 2000) (citing cases). Although the amount of time spent on a particular task may be considered when determining whether the task is "essential" an essential function "need not encompass the majority of an employee's time, or even a significant quantity of time to be essential." Basith v. Cook County, 241 F.3d 919, 929 (7th Cir. 2001) (citations omitted); see also Winfrey v. City of Chicago, 259 F.3d 610, 616 (7th Cir. 2001) (The fact "that not all employees perform at a particular time all the essential job functions does not make those functions non-essential."); Hoskins v. Oakland County Sheriff's Dept., 227 F.3d 719, 727 (6th Cir. 2000) (holding that although a correctional officer may only infrequently be required to restrain inmates, the potential for physical confrontation exists on a daily basis making the ability to restrain an essential function).

By the same token, however, federal regulations specifically mandate that a court consider "[t]he current work experience of incumbents in similar jobs." 29 C.F.R. § 1630.2(n)(vii) (2010). Thus, where there are positions within a particular job classification where an employee never has to perform certain alleged requirements, a genuine issue of material fact arises as to whether those requirements are in fact "essential." See, e.g., Cripe v. City of San Jose, 261 F.3d 877, 888-89 (9th Cir. 2001) (finding genuine issue of material fact as to essential functions where city presented evidence that all police officers, even those working in lighter duty capacities, needed certain physical abilities in the event of emergencies and plaintiff responded with evidence that lighter duty

police officers never engaged in strenuous activity); <u>Doris v. City of Kentwood</u>, No. CIV.A.94-249, 1994 WL 762219, at *3 (W.D. Mich. Oct. 4, 1994) (finding that, where city presented written job description showing that all police officers have certain physical requirements and plaintiff responded with evidence that positions existed where such physical requirements were never required, a genuine issue of material fact remained as to essential functions of job).

In this case, Plaintiff has presented testimony that the Philadelphia Police Department employs in the following units uniformed officers whose typical job functions either infrequently or never include active patrol duties: Police Academy, Court Liaison, Evidence Custodian, Building Security, Crime Scene, Staff Services, Detention, Narcotics, Research and Planning, Reports Control, and Differential Response. (Madden Dep. 55:11-58:10.) The fact that there are multiple crucial positions for uniformed officers within the Philadelphia Police Department who have no need to apprehend suspects, patrol, or use a weapon significantly bolsters Plaintiff's position that these are not essential job functions for all police officers.

In an effort to eliminate this apparent issue of fact, Defendant makes two additional arguments. First, Defendant contends that Plaintiff effectively admitted that he could not do the essential functions of his job. Specifically, at his deposition, the following exchange occurred:

Q.   . . . After you got hurt, were these things about the police officer job that you could not do?
A.   Right, the functions of a regular police officer. No, I couldn't do the functions as a regular police officer, without being – you know, if I was okay, yes. If I'm hurt, no.
Q.   Anything other than carrying your weapon, physically restraining somebody that maybe was trying to get away, anything else that you couldn't do because of the injury?
A.   Yeah.
Q.   That, in your mind were regular functions –
A.   A regular patrol officer.
Q.   Couldn't be on the street?
A.   Right, that was the main – that's the main thing.

(Acevedo Dep. 18:3-22.)  A fair reading of this testimony, however, reflects only that Plaintiff conceded his inability to do the *regular* functions of a *patrol* officer, i.e. one who was out on the street.  Nothing in his testimony suggests an admission that he could not function as a police officer in another capacity, as he did in the Traffic Division.  Nor does Defendant demonstrate that (a) Plaintiff understood that question regarding "regular functions" was referencing the legal term "essential functions" as defined in the Rehabilitation Act; or (b) Plaintiff had sufficient knowledge of what the official, established "essential functions" were for a Philadelphia police officer.[5]

Second, Defendant cites to a series of federal cases wherein courts found that police officers and other public safety officials who are unable to perform certain physical job functions, such as physically restraining others or discharging a weapon, are not "qualified individuals" under the disabilities laws.  (Def.'s Mot. Summ. J. 11-15.)  All of these cases, however, made a determination, on the basis of the facts and evidence before the court at the time, that no genuine issue of fact existed as to the essential functions of the police officer positions in question.  See, e.g., Frazier v. Simmons, 254 F.3d 1247, 1259-60 (10th Cir. 2001) (finding that multiple physical requirements for police officer were essential functions where the written job description listed these multiple physical requirements and plaintiff had no probative contrary evidence); Hoskins v. Oakland County Sheriffs Dept., 227 F.3d 719, 726-27 (6th Cir. 2000) (finding that requirement of ability to restrain and search inmates was essential function of deputy sheriff position where written job description listed them and "potential for physical confrontation exist[ed] on a daily basis"; court noted that "inquiry into whether a function is essential is highly fact specific."); Champ v. Baltimore County,

---

[5]  Defendant also cites to testimony given by Plaintiff in an Act 111 hearing where in he stated that he could not return, with his injury, to full duty as a police officer, but could return to light duty.  (Def.'s Mot. Summ. J., Ex. N, 69-70.)  Again, Plaintiff's belief that he could not work full-duty in the position he previously held does not establish that he was precluded from performing the essential functions of all Philadelphia police officer positions.

91 F.3d 129 (4th Cir. 1996) (affirming district court finding that certain physical requirements were essential functions of Baltimore police officer position where defendant provided evidence of that requirement and plaintiff offered no contrary evidence); Simon v. St. Louis County, 735 F.2d 1082, 1085 (8th Cir. 1984) (affirming conclusion that police department's physical requirements were essential functions where defendant offered expert testimony that forceful arrest policy was nationwide standard that was reasonable, legitimate, and necessary, and plaintiff produced only testimony from some police officers from other states who testified that they were still employed notwithstanding a physical inability to make forceful arrests).[6]

On the other hand, Defendant fails to acknowledge the similar multitude of cases that have declined to make a factual determination of the essential functions of a police officer position where probative, contradictory evidence was presented to the court. See, e.g., Cripe, 261 F.3d at 888-89 (finding a factual dispute as to whether the ability to make a forcible arrest was an essential function of *all* the specialized-assignment positions in the police department that the plaintiffs sought the opportunity to fill, notwithstanding defendant's assertion that all police officers needed to be able to respond in a city-wide emergency); Keys v. City of Philadelphia, No. CIV.A.04-766, 2005 WL 3234847, at *5 (E.D. Pa. Nov. 29, 2005) (finding triable issue of fact as to what the precise essential functions of a Philadelphia Police Officer were where plaintiffs "testified that active patrol duties were not required in the jobs they held prior to their separation and that they were performing all the essential functions of those positions-even the marginal functions-without accommodations."); King v. Town of Wallkill, 302 F. Supp. 2d 279, 290 (S.D.N.Y. 2004) (finding genuine issue of material

---

[6] Defendant also cites Allen v. Hamm, No. CIV.A.05-879, 2006 WL 436054 (D. Md. Feb. 22, 2006), Harman v. Rafferty, No. CIV.A.04-2027, 2005 WL 3285980 (M.D. Pa. Jul. 26, 2005), and Ethridge v. State of Alabama, 860 F. Supp. 808 (M.D. Ala. 1994), all of which similarly noted that plaintiff failed to produce sufficient evidence to dispute the defendant's showing of the essential functions of the particular positions at issue.

fact as to essential functions for the police officer position at issue); <u>Konewko v. Village of Westchester</u>, No. CIV.A.99-7277, 2000 WL 1038125, at *8 (N.D. Ill. Jul. 25, 2000) (finding genuine issue of material fact where defendant claimed ability of police officer to apprehend suspects was essential function of position and plaintiff countered with sufficient evidence that defendant had previously assigned police officers to duties that did not require them to apprehend suspects).[7]

In short, taking all reasonable inferences in the light most favorable to Plaintiff, the Court declines to conclusively rule on whether the ability to use a handgun, arrest suspects, and physically restrain individuals are essential functions of the police officer position within the Philadelphia Police Department. "Whether a particular function is essential is a factual determination that must be made on a case by case basis based upon all relevant evidence." <u>Turner v. Hershey Chocolate U.S.</u>, 440 F.3d 604, 612 (3d Cir. 2006). Contrasting the affidavit of Deputy Commissioner Gaittens[8] with both the written description of the position and the evidence of other positions within

---

[7] Although not raised anywhere in its Motion for Summary Judgment, Defendant's Response to Plaintiff's Motion for Summary Judgment cites to Pennsylvania statute 42 Pa.C.S. § 8954, which states that, "[a]ny person employed as a municipal police officer who is subject to the mandatory certification requirements of the training law and fails to obtain the required certification from the Commissioner of the Pennsylvania State Police within the time limits provided by law shall cease to be empowered or authorized to function as a municipal police officer for any purpose whatsoever." (Def.'s Resp. Pl.'s Mot. Summ. J. 10-11 (citing 42 PA. CONS. STAT. § 8954 (2007)).) The Court does not find – and Defendant does not argue – that this statute expressly mandates that all municipal officers receive a state firearm certification. Rather, the plain language simply indicates that any officer who is required to receive such a certification and fails to do so may not exercise any police power.

[8] Plaintiff contends that this Court should disregard the Gaittens affidavit because it is self-serving and Gaittens is an interested witness. Plaintiff is correct that "conclusory, self-serving affidavits are insufficient to withstand a motion for summary judgment." <u>Kirleis v. Dickie, McCamey & Chilcote</u>, 560 F.3d 156, 161 (3d Cir. 2009) (citations omitted). "An affidavit that fails to set forth specific facts and is conclusory in nature fails to satisfy the party's burden." <u>In re Diet Drugs (Phentermine/Fenfluramine/Dexfenfluramine) Prods. Liab. Litig.</u>, No. CIV.A.04-20219, 2009 WL 3444767, at *2 (E.D. Pa. Oct. 23, 2009) (citing <u>Maldonado v. Ramirez</u>, 757

the Police Department that do not require these physical abilities, the Court simply cannot make the inherently factual determination of whether these requirements are indeed "essential" within the meaning of the statute. This genuine issue of material fact thus precludes this Court from proceeding to the question of whether Plaintiff could perform those functions with or without a reasonable accommodation. In turn, without resolution of these inquiries, Defendant cannot prove Plaintiff's inability to succeed on his discrimination claims.

**B.**     **Whether Plaintiff Has Standing to Bring a Claim for a Facial Violation of the Rehabilitation Act**

Count III of Plaintiff's Complaint alleges, in part, that Regulation 32 facially violates § 504 of the Rehabilitation Act of 1973, as follows:

> it purports to deny public employees of their employment on the basis of their disability based on, inter alia, (1) genesis of such disability; (2) without an interactive process; (3) automatically and without consideration of the individual nature of the disability, the individual's vocational profile and whether or not they are otherwise qualified to continue their City employment; (4) without any consideration of how the individual could be accommodated in the position they hold or desire; and (5) by requiring that the individual have the capacity to perform all the duties of his/her pre-injury position without accommodation.

(Compl. ¶ 33.) Defendant now counters that Plaintiff lacks standing to pursue this claim.

The question of standing "involves both constitutional limitations on federal court jurisdiction and prudential limitations on its exercise." Bennett v. Spear, 520 U.S. 154, 162 (1997) (quoting Warth v. Seldin, 422 U.S. 490, 498 (1975). The constitutional component of standing, which stems from Article III of the United States Constitution, requires that a plaintiff demonstrate

---

F.2d 48, 57 (3d Cir.1985)). The Third Circuit, however, has also held that "in considering a motion for summary judgment the court should believe uncontradicted testimony unless it is inherently implausible even if the testimony is that of an interested witness." Lauren W. ex rel. Jean W. v. DeFlaminis, 480 F.3d 259, 272 (3d Cir. 2007).

In this matter, Gaittens, as Deputy Commissioner of the Philadelphia Police Department, is qualified to speak on such matters and his affidavit is sufficiently specific so as not to be, on its face, entirely self-serving. Accordingly, the Court considers it when ruling on this motion.

(1) that he or she suffered an "injury in fact;" (2) that the injury is "fairly traceable" to the actions of the defendant; and (3) that the injury "will likely be redressed by a favorable decision." Id. (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992) and Valley Forge Christian Coll. v. Ams. United for Separation of Church and State, Inc., 454 U.S. 464, 471-72 (1982)).

Defendant maintains that the ADA and Rehabilitation Act are violated only where the employer fails to provide a reasonable accommodation where one is required. Because Plaintiff allegedly cannot perform the essential functions of his job, with or without accommodation, Defendant asserts that Plaintiff is not an otherwise qualified individual entitled to protection under the Act. Absent a cognizable injury in fact resulting from the application of Regulation 32 to him, Plaintiff appears to have no standing to pursue a facial invalidity claim.

Defendant's contention, however, is misplaced for the same reasons that its challenge to Counts I and II fails. As noted above, a genuine issue of material fact remains as to what the essential functions were of the Philadelphia Police Officer position from which Plaintiff was terminated. This dispute precludes any determination as to whether Plaintiff is an "otherwise qualified individual," such that he could perform the essential functions of his job, with or without accommodation. Absent such a determination, Defendant cannot prevail on its standing argument.

C.    **Whether Regulation 32 Facially Violates the Rehabilitation Act**

Defendant next asserts that, regardless of standing, Plaintiff's facial invalidity claim fails on its merits. Upon review of the parties' arguments, this Court must agree.

A statute that facially discriminates against disabled individuals faces a "skeptical inquiry under the ADA and Rehabilitation Act." New Directions Treatment Serv. v. City of Reading, 490 F.3d 293, 301-02 (3d Cir. 2007). Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under

31

any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). Relying on these principles, Plaintiff alleges that Regulation 32 facially violates Section 504 because "it is a method of administration which has the purpose or effect of discriminating against persons with qualifying and statutorily protected disabilities." (Compl. ¶ 34.)

Plaintiff's argument, however, is misplaced. The Rehabilitation Act "does not prohibit discrimination against *any individual* on the basis of disability, but, as a general rule, only protects from discrimination those disabled individuals who are able to perform, with or without reasonable accommodation, the essential functions of the job they hold or desire." Hohider v. United Parcel Serv., Inc., 574 F.3d 169, 191 (3d Cir. 2009) (emphasis in original); see also Donahue, 224 F.3d at 229 (holding that a plaintiff must establish that "he or she is otherwise qualified to perform the essential functions of the job with or without reasonable accommodation") (quotation omitted). Nothing in the Act requires an employer to create positions or implement accommodations that pose an undue hardship[9] to the employer in order to continue to employ a disabled individual. Shiring, 90 F.3d at 832.

In apparent recognition of these legal dictates, Regulation 32 specifically tracks the language of the Rehabilitation Act and defines "disability" as follows:

> a physical or mental condition caused by injury or occupational disease, including heart and lung ailments, which is service-connected and *prevents an employee from performing the essential functions of the job classification to which the employee is assigned, with or without accommodation.*

(Regulation 32 § 32.022 (emphasis added).) Accordingly, by its own terms, Regulation 32's separation provision only operates when the employee has fallen outside the protection of the

---

[9] "'Reasonable accommodation' means measures such as 'job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, . . . and other similar accommodations for individuals with disabilities.'" Freeman v. Chertoff, 604 F. Supp. 2d 726, 734 (D.N.J. 2009) (quoting 42 U.S.C. § 12111(9)(B)).

Rehabilitation Act. To the extent that Regulation 32 allows the City to terminate employees who are permanently and partially disabled, such employees would be unable to make out a *prima facie* case under the Act. Accordingly, nothing on the face of Regulation 32 violates § 504.[10]

Alternatively, Plaintiff argues, without citation to any legal support, that the text of Regulation 32 – in direct violation of § 504 – does not provide an interactive process for determining whether a reasonable accommodation is possible, thereby rendering the entire Regulation improper. Plaintiff's contention, however, relies on the faulty assumption that the Rehabilitation Act mandates an interactive process without the initial showing that the employee is "otherwise qualified." Quite to the contrary, the Third Circuit has stated as follows:

> While . . . we have admonished "employers [to] take seriously the interactive process," . . . we have not found an employer's failure to engage in that process and grant an employee individualized consideration, with nothing more, amounts to discrimination prohibited under the ADA. Rather, if the employee "is not a 'qualified individual' under the ADA, . . . [the employer's] alleged failure to investigate into reasonable accommodation is unimportant." . . . "If it turns out there is no job which the worker (with or without accommodation) is capable of performing, then the company cannot be held liable for an ADA . . . violation." . . .
>
> Accordingly, while "an employer who fails to engage in the interactive process runs a serious risk that it will erroneously overlook an opportunity to accommodate a statutorily disabled employee, and thereby violate the ADA," Deane v. Pocono Med. Ctr., 142 F.3d 138, 149 (3d Cir.1998) (en banc), failure to engage in the interactive process, in itself, does not constitute such a violation.

Hohider, 574 F.3d at 193 (footnote and most internal citations omitted); see also Parker v. Verizon Pa., Inc., 309 Fed. Appx. 551, 560 (3d Cir. 2009) (noting that to establish a prima facie case for failure to participate in the interactive process, plaintiff must show, in part, that the employee could

---

[10] To the extent that Plaintiff argues that Regulation 32 has not been neutrally applied by Police Commissioner Johnson, that claim does not make the Regulation facially violative of the Rehabilitation Act. Rather, such a claim alleges only disability discrimination pursuant to the Act, the resolution of which is precluded by the aforementioned issue of fact.

have been reasonably accommodated but for the employer's lack of good faith).

As noted above, Regulation 32's separation procedure only applies where an employee is "disabled," i.e. has a physical or mental impairment that prevents the employee from performing the essential functions of his or her position with or without reasonable accommodation. Accordingly, no interactive process is mandated. Even if it were, the mere absence of such an interactive process, without a showing that Regulation 32 routinely prohibits consideration of reasonable accommodations, would not render the Regulation facially invalid.[11]

In short, the Court finds no basis on which to deem Regulation 32 facially violative of the Rehabilitation Act. Accordingly, we grant summary judgment in favor of Defendant on this claim.

### D.    Whether Plaintiff's Disparate Impact Claim Fails on its Merits

In addition to alleging facial invalidity, Count III of the Complaint asserts that Regulation 32 has a disparate impact on persons with qualifying or statutorily protected disabilities. Defendant contends that this claim must be dismissed because Plaintiff has not provided any statistical evidence showing that the method of administration of this Regulation has the effect of disproportionately excluding a protected class from certain opportunities. (Def.'s Mot. Summ. J. 18.) In response, Plaintiff admits that he does not present statistical evidence, but claims that there is no need for him to do so "since it is plain that Regulation 32 has a disparate impact on individuals with disabilities." (Pl.'s Resp. Def.'s Mot. Summ. J. 13.)

"A disparate impact violation is made out when an employer is shown to have used a

---

[11]   The parties dispute whether Regulation 32 either provides or allows for an interactive process for determining whether a reasonable accommodation is possible or available. Plaintiff contends that the Police Department does not engage in any such process, whereas Defendant argues that the Medical Director actually does engage in such a process prior to making her disability determinations. Because the Court finds that Regulation 32 does not facially violate the Rehabilitation Act, we need not address these arguments. Nonetheless, in a later portion of this decision, the Court addresses whether the process provided satisfies due process requirements.

specific employment practice, neutral on its face but causing a substantial adverse impact on a protected group, and which cannot be justified as serving a legitimate business goal of the employer." E.E.O.C. Metal Serv. Co., 892 F.2d 341, 346 (3d Cir. 1990). In other words disparate-impact claims "involve employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity." Int'l Bhd. of Teamsters v. United States, 431 U.S. 324, 335-36, n.15 (1977). Under a disparate impact theory of discrimination, "a facially neutral employment practice may be deemed [illegally discriminatory] without evidence of the employer's subjective intent to discriminate that is required in a 'disparate-treatment' case." Raytheon Co. v. Hernandez, 540 U.S. 44, 52-53 (2003) (quoting Wards Cove Packing Co. v. Atonio, 490 U.S. 642, 645-646 (1989)).

A *prima facie* case of disparate impact discrimination requires that the plaintiff first identify "the specific employment practice that is challenged."[12] Watson v. Fort Worth Bank and Trust, 487 U.S. 977, 994 (1988). Second, the plaintiff must show causation by offering "statistical evidence of a kind and degree sufficient to show that the practice in question has caused the exclusion of applicants for jobs or promotions because of their membership in a protected group." Id.; see also Foxworth v. Pa. State Police, 228 Fed Appx. 151, 156-57 (3d Cir. 2007). Notably, the Supreme Court has held that disparate impact, by itself, does not state a prima facie case under § 504.

_____

[12] In its Response to Plaintiff's Motion for Summary Judgment, Defendant argues that Regulation 32 is not a "method of administration," "qualification standard," or other specific employment practice as is typically required in a disparate impact claim. (Def.'s Resp. Pl.'s Mot. Summ. J. 7.) The Court disagrees. Regulation 32 is a method used to discharge certain individuals from City employment based on certain disabilities or injuries. Such a practice clearly satisfies Plaintiff's burden for purposes of his disparate impact claim. See Lanning v. Se. Pa. Transp. Auth., 181 F.3d 478, 489-90 (3d Cir. 1999) ("[t]he disparate impact theory of discrimination combats not intentional, obvious discriminatory policies, but a type of covert discrimination in which facially neutral practices are employed to exclude, unnecessarily and disparately, protected groups from employment opportunities. ").

Alexander v. Choate, 469 U.S. 287, 299 (1985); see also Hollonbeck v. U.S. Olympic Comm., 513 F.3d 1191, 1197 (10th Cir. 2008), cert. denied, 129 S. Ct. 114 (2008). "Rather, actionable disparate impact requires analysis of whether the individual is otherwise qualified and whether reasonable accommodations may provide meaningful access." Hollonbeck, 513 F.3d at 1197 (citing Choate, 469 U.S. at 299-301); see also Crocker v. Runyon, 207 F.3d 314, 321 (6th Cir. 2000) ("The Rehabilitation Act's 'otherwise qualified' language specifically allows for disabled people to be disparately affected by legitimate job criteria, so a wholesale importing of Title VII's disparate impact cause of action into the Rehabilitation Act context might be inappropriate.").

Plaintiff's argument that "it is plain that Regulation 32 has a disparate impact on individuals with disabilities" fails to meet this standard. (Pl.'s Resp. Def.'s Mot. Summ. J. 13.) Plaintiff can undoubtedly prove that Regulation 32 disparately impacts – and in fact only impacts – individuals with disabilities. Not all individuals with disabilities, however, are protected by the dictates of § 504 of the Rehabilitation Act. Rather, as discussed above, § 504 protects only "qualified individuals." 42 U.S.C. § 12111(8). Accordingly, Plaintiff must put forth statistical evidence showing that Regulation 32 has disparately caused the exclusion or termination of employees solely on the basis of their disability, despite the fact that such employees could perform the essential functions of their position with or without accommodation. By his own admission, Plaintiff has no such statistical evidence in his possession.

Alternatively, Plaintiff argues the Police Department's specific application of Regulation 32 has a disparate impact   He explains that Police Commissioner Johnson has approved the separations of every police officer whom the Medical Director designated permanently and partially disabled, "even if the officer could fully perform the functions of his/her own job, either with or without accommodation." (Pl.'s Resp. Def.'s Mot. Summ. J. 11.) In support of this statement of fact, however, Plaintiff only cites to Defendant's response to a request for admission, in which

36

Defendant admitted solely that "Commissioner Johnson approved all separations of police officers *who could not perform the essential functions of the police officer position.*" (Pl.'s Mot. Summ. J., Ex. K, Response to Request No. 70 (emphasis added).) Plaintiff cites to no testimonial evidence, statistics, or illustrative examples to establish that the Police Department has applied Regulation 32 in such a manner as to disparately impact individuals with disabilities who were otherwise qualified for their positions.

Finally, in his Cross-motion for Summary Judgment, Plaintiff attempts to equate Regulation 32 with a "full duty recovery policy" which categorically excludes individuals with disabilities from being employed as police officers. According to Plaintiff such policies are facially invalid "as they purport to evade the ADA's mandatory duty to individually assess the nature of an employee's restrictions and the feasibility of accommodations with regard to a particular job." (Pl.'s Mem. Supp. Mot. Summ. J. 13-14.)

This argument, however, is inapposite. In the cases cited by Plaintiff, the challenged policies precluded disabled individuals from obtaining or returning to particular jobs unless they were "100% healed" from their impairments, without individual consideration of whether they could perform all the essential functions of those jobs – as opposed to marginal or non-essential functions – with or without accommodation.[13] Regulation 32, on the other hand, is not remotely

---

[13] See, e.g., Henderson v. Ardco, 247 F.3d 645, 653 (6th Cir. 2001) (recognizing that 100% recovery rules may have an impermissible discriminatory impact where rule allows for no subjective inquiry into individual's abilities to perform certain available jobs); McGregor v. Nat'l R.R. Passenger Corp., 187 F.3d 1113, 1116 (9th Cir. 1999) (noting that a "100% healed" or "fully healed" policy "discriminates against qualified individuals with disabilities because such a policy permits employers to substitute a determination of whether a qualified individual is '100% healed' from their injury for the required individual assessment whether the qualified individual is able to perform the essential functions of his or her job either with or without accommodation."); Hutchinson v. United Parcel Serv., Inc., 883 F. Supp. 379, 397 (N.D. Iowa 1995) (invalidating the "100% healed" policy of UPS, which did not make an individual assessment of an individual's ability to perform the essential functions of the person's job with or

akin to a fully-healed policy. By its own terms, the determination of whether an employee is disabled is made entirely on an individualized basis by the Medical Director and is premised on medical histories, reports from the employee's physician, testimony, or other evidence submitted by either the employee or the City's third-party administrator. (Regulation 32 § 32.03.) In making the disability determination, the Medical Director considers the employee's viewpoint, all submitted medical documentation, and the essential functions of the position in which the employee is serving. (Korevaar Aff. ¶ 5.) Both the treating doctor's assessment and individual employee's assessment are given great weight. (Korevaar Dep. 33:16-25, 45:4-17; 52:19-53:12.) Only if an employee cannot perform all of the essential functions of the job classification to which the employee is assigned, with or without accommodation, is the employee deemed "disabled" under the Regulation. (Regulation 32 §§ 32.022, 32.026; Korevaar Aff. ¶ 5; Cornell Dep. 21:10-22:6.) Such individualized assessment is a far cry from the fully healed policies struck down as per se violative of the Rehabilitation Act.

---

without accommodation following injury and resulting permanent disability, but substituted for this inquiry a determination of whether the person is "100% healed" from the injury.); Stillwell v. Kansas City Bd. of Police Comm'r, 872 F. Supp. 682, 686-87 (W.D. Mo. 1995) (holding that an across-the-board exclusion on all one-handed applicants for private security guard license by simply assuming that they cannot meet the physical eligibility requirements "runs afoul" of the required individualized assessment); Sarsycki v. United Parcel Serv., 862 F. Supp. 336, 341 (W.D. Okla. 1994) (finding that blanket UPS regulation that barred insulin-dependent diabetics from driving motor vehicles under 10,000 pounds, without consideration of the individual's specific limitations or whether a reasonable accommodation was available, was impermissible); Lane v. Pena, 867 F. Supp. 1050, 1070-71 (D.D.C. 1994) (per se exclusion of all diabetics from Coast Guard program violated Rehabilitation Act); Bombrys v. City of Toledo, 849 F. Supp. 1210, 1216-19 (N.D. Ohio 1993) (blanket exclusion preventing insulin-dependent diabetics from becoming police officers violated ADA); Galloway v. Superior Court of the Dist. of Columbia, 816 F. Supp. 12, 19 (D.D.C. 1993) (Title II of ADA violated by categorical exclusion of all blind persons from jury service); Anderson v. Little Leage Baseball, 794 F. Supp. 342, 344-45 (D. Ariz. 1992) (holding that policy of prohibiting youth baseball coaches in wheelchairs from being on field, regardless of coach's disability or field or game conditions involved, fell far short of ADA's individualized assessment requirements).

Therefore, Plaintiff has failed to create a genuine issue of material fact as to the viability of his disparate impact claim.  Although bearing the burden of doing so, Plaintiff has not produced any evidence to establish that Regulation 32 disparately results in the separation of "otherwise qualified" disabled individuals from their positions as Philadelphia Police Officers.  Absent such a showing, the Court must grant Defendant's Motion for Summary Judgment on this claim.[14]

### E.      Whether Plaintiff Alleges a Viable Due Process Claim

In the final count of the Complaint, Plaintiff alleges that Regulation 32 violates the Due Process Clause of the Fourteenth Amendment.  He reasons that he had a property interest in his public employment which was procedurally protected by the Due Process Clause, and that Defendant, as a state actor, dismissed Plaintiff from his employment without affording him proper procedural protections.  Defendant now contends that this claim must fail because (1) Regulation 32 provides sufficient due process prior to separation and (2) Plaintiff failed to take advantage of those available procedures.

In Cleveland Bd. of Ed. v. Loudermill, 470 U.S. 532 (1985), the United States Supreme Court held that the Due Process Clause recognizes that public employees have a property right in continued employment and may not be deprived of that property right by the state without due process of law.  Id. at 541-42.  In defining what process was due, the Court found that the public employee was entitled to "some kind of a hearing" and a "pretermination opportunity to respond."  Id. at 542.  The Court went on to explain that the hearing did not need to be an "elaborate" or "full adversarial evidentiary hearing," recognizing that the formality and procedural requirements could vary depending on the importance of the interests involved and the nature of subsequent

---

[14]  The parties also present arguments as to whether, assuming Plaintiff has properly asserted a disparate impact claim, the defenses of job relatedness and business necessity insulate Defendant from liability.  Having already found that Plaintiff has not presented a viable disparate impact claim, the Court need not address these arguments.

proceedings.  Id. at 545.  It further noted that the hearing "need not definitively resolve the propriety

of discharge," and that "[i]t should be an initial check against mistaken decisions – essentially, a

determination of whether there are reasonable grounds to believe that the charges against the

employee are true and support the proposed action."  Id. at 545-46.  Ultimately, the Court held that

the sole essential requirements of due process were notice and an opportunity to respond by

presenting reasons, either in person or in writing, why proposed action should not be taken."  Id. at

546; see also Gilbert v. Bomar, 520 U.S. 924, 929 (1997) ("pretermination process need only

include oral or written notice of the charges, an explanation of the employer's evidence, and an

opportunity for the employee to tell his side of the story.").

     The analogous Third Circuit case of Wilson v. MVM, 475 F.3d 166 (3d Cir. 2007) defined

some of the due process boundaries in cases of medically-based terminations.  In that matter, three

court security officers ("CSO's"), employed by the U.S. Marshall's Service ("USMS") were deemed

medically disqualified due to various medical conditions and were thus terminated.  Id. at 171.

They brought suit claiming, in part, that the USMS violated their due process rights.  Id.  The Third

Circuit acknowledged that the CSO's had a constitutionally protected property interest in their

employment and were entitled to notice and opportunity to be heard.  Id. at 177-78.  In order to

define what process was due, the court balanced the plaintiffs' interest in continued employment

against the government's interests in providing "healthy, physically qualified security to protect its

court houses and employees," and then examined "the risk of error in the procedure used compared

with the degree of improved accuracy that additional procedures would provide."  Id. at 78-79

(citing Matthews v. Ethridge, 424 U.S. 319, 325 (1976)).  Ultimately, the court held that the CSO's

were accorded sufficient process under the Due Process Clause:

          [a]fter the appellants were termed medically disqualified, but before they were
          terminated, they were provided with notice of their medical disqualification and
          offered an opportunity to respond with medical documentation from their own

40

doctors regarding their ability to perform their positions. While this is not a traditional hearing, the process afforded the appellants is sufficient given the balance of their interest in maintaining employment and the government's interest in security. A more rigorous process would not significantly enhance the accuracy of the medical qualification process.

Id. at 179.

Similarly, in Wagner v. Pa. Capitol Police Dept., No. CIV.A.07-1310, 2009 WL 453281 (M.D. Pa. Feb. 23, 2009), plaintiff, a Pennsylvania Capitol police officer, began to have seizures and was out of work until cleared to return to light duty, including restrictions of no access to firearms, no driving, no patrol duties, and only desk work. Id. at *1. After some delay, Defendants gave plaintiff a light duty position. Id. Eventually, plaintiff's doctor released him to full duty work, after which he took sick leave. Id. at *2. As a result of this new medical information, defendants informed plaintiff that his light duty assignment would end and gave him the option of returning to full duty work or using paid or unpaid leave. Id. Plaintiff requested an accommodation, but, via a subsequent letter from his doctor, indicated that he could not perform two essential functions of his job. Id. Defendants concluded that no reasonable accommodation was available for plaintiff and terminated him. Id. Plaintiff filed grievances over the state police's refusal to return him to light duty work and subsequently initiated a law suit claiming, in part, deprivation of due process. Id. at *3. Considering the three Matthews factors, the court disagreed, finding:

[f]irst, plaintiff had process in this matter: he was out on leave and apparently knew that he had to apply for reinstatement when his physical condition allowed. He thus had notice of what was required to regain his job. He provided the defendants with information that he claimed entitled him to return to work in a light-duty position. The evidence indicates that defendants examined this information, but did not find a light-duty position for the plaintiff at that time. As such, he had notice and an opportunity to be heard. Given the fact that plaintiff had available – and made use of – a grievance procedure to contest this decision, and though plaintiff's return to work may have been delayed, the risk of an erroneous deprivation was small, and requiring additional procedures when such procedures were available to challenge the decision would be wasteful.

Id. at *7; see also Buttitta v. City of Chicago, 9 F.3d 1198, 1206 (7th Cir. 1993) (holding that procedure allowing police officer, who has been discharged from duty due to physical disability, to file a grievance, receive records, and pursue alternative avenues of redress, including arbitration, adequately satisfies the requirements of due process).

The procedures at issue in this case offer little substantive difference from those cited above. The uncontradicted evidence presented by Defendant reveals that if a police officer is injured on duty, his or her employment status is governed by Regulation 32. (Regulation 32 § 32.023.) When the Medical Director first receives notice from the employee's health care providers stating that the employee has reached "maximum medical improvement," she schedules a meeting with the employee to discuss his or her disability status and review any medical documentation brought by the employees from their own medical providers, as well as documentation from the City's third-party administrator. (Korevaar Aff. ¶ 3.) The Medical Director then takes into consideration the employee's viewpoint, all submitted medical documentation, and the essential functions of the position in which the employee is serving. (Id. ¶ 5.) Based on all of this information and the meeting with the employee, the Medical Director makes a disability determination and, in cases of permanently and partially disabled employees, either recommends separation or meets with the employee to discuss other potential options such as the "secondary employment" program or the provision of additional time to allow further recovery. (Cornell Dep. 29:5-30:3.) The determination is not final and separation cannot occur until the Police Commissioner signs off on the recommendation. (Madden Dep. 84:22-85:13; Pl's Mot. Summ. J., Ex. K, Response to Request No. 65.) If the employee is dissatisfied with the outcome, he may, at his own expense, seek review by the Medical Board and may present to the Board any medical histories, reports, or testimony. (Regulation 32 § 32.0313.) The findings and conclusions of the Medical Board are then subject to appeal to the Civil Service Commission. (Regulation §§ 32.0314; 32.12.)

In light of the aforementioned jurisprudence and balancing the three <u>Matthews</u> factors, the Court finds that such process was certainly adequate. First, Plaintiff's interest in continued employment balances relatively equally against Defendant's interests in providing qualified police officers to protect the City's residents. Moreover, considering "the risk of error in the procedure used compared with the degree of improved accuracy that additional procedures would provide," the Court finds that the procedures used were more than sufficient. Plaintiff was put on notice of the Medical Director's initial disability determination. He was then provided the opportunity to meet with the Medical Director, discuss his position, and provide additional medical records from his own doctors that could affect the final determination; *i.e.*, he had the opportunity to "tell his side of the story."[15] While not a traditional hearing, the process sufficiently balanced the interests of both parties. The Due Process Clause requires no more. If dissatisfied with the decision, Plaintiff could

---

[15] Plaintiff contends that "[w]hen an employee receives notice of a meeting with the Medical Director he/she is not informed that the outcome of this meeting may be separation from employment. . . . Thus, this meeting can hardly be construed as a 'remedy.'" (Pl.'s Resp. Def.'s Mot. Summ. J. 14.) Putting aside the fact that the evidence cited by Plaintiff does not stand for this proposition, Plaintiff fails to prove that his notice was anything less than adequate. When first given his May 12, 2006 limited-duty assignment, he was informed that it was a temporary position, that it was an "intermediate step in [his] recovery to Active Duty," and that "Occupational Health Services' reports [would] be reviewed to monitor [his] progress." (Def.'s Mot. Summ. J., Ex. D.) The subsequent June 22, 2008 letter from the City to Plaintiff stated that "[a]s a result of your work related injury of 6/21/04 you have been scheduled to meet with the City of Philadelphia's Medical Director to discuss your disability. An appointment has been made for Wednesday, June 28, 2006 at 11:00 AM. . . . If you have any questions or concerns, please call me at (215) 683-1723." (Def.'s Mot. Summ. J. Ex. E.) Thus, Plaintiff had the ability to ascertain the full nature and potential ramifications of his hearing. Following Plaintiff's failure to appear at that meeting, Dr. Korevaar reviewed his medical records, made a determination, and informed him, by letter dated July 20, 2006, that he was medically unable to return to his pre-injury position and that that determination is the "basis for [his[ department to separate [him] from employment with the City." (Def.'s Mot. Summ. J., Ex. H.) On August 25, 2006, one full month after the initial determination, Police Commissioner Johnson informed Plaintiff that he was to be separated from City employment. (Def.'s Mot. Summ. J., Ex. I.) The mere fact that Plaintiff failed to raise an objection until after that last letter does not render the prior notice constitutionally insufficient.

have appealed to both the Medical Board and the Civil Service Commission.  Plaintiff now fails to

show how a more rigorous process would have significantly enhanced the accuracy of the medical

qualification process.

Even assuming *arguendo* that the Court were to find such procedures questionable, Plaintiff

would nonetheless be precluded from pursuing this claim due to his failure to avail himself of the

procedures provided to him. "In order to state a claim for failure to provide due process, a plaintiff

must have taken advantage of the process that are available to him or her, unless those processes are

unavailable or patently inadequate." Alvin Suzuki, 227 F.3d 107, 116 (3d Cir. 2000). "'[A] state

cannot be held to have violated due process requirements when it has made procedural protections

available and the plaintiff has simply refused to avail himself of them.'" Id. (quoting Dusanek v.

Hannon, 677 F.2d 538, 543 (7th Cir. 1982)).  In other words, "[i]f there is a process on the books

that appears to provide due process, the plaintiff cannot skip that process and use the federal courts

as a means to get back what he wants." Id.  "When access to procedure is absolutely blocked or

there is evidence that the procedures are a sham, the plaintiff need not pursue them to state a due

process claim." Id. at 118.  In such cases, however, the plaintiff must provide "concrete evidence"

that the process would be futile.  Id.  Moreover, "an allegation that initial stages of a process [have]

been biased does not mean that the later processes will be biased as well." Id. at 119.

In this case, after being on light duty for over two years, Plaintiff received a letter scheduling

him for a meeting with the City of Philadelphia's Medical Director to discuss his disability.  (Def.'s

Mot. Summ. J., Ex. E.)  By all accounts, Plaintiff failed to appear at the meeting, did not call to

report his absence, and did not attempt to reschedule.  (Def.'s Mot. Summ. J., Ex. F.)  Although he

was informed of the Medical Director's determination on July 20, 2006, he was not separated until

August 27, 2006.  ((Def.'s Mot. Summ. J., Exs. H, I.)  In the interim, he never sought to dispute the

Medical Director's decision.  Following his ultimate termination, Plaintiff failed to exercise his right to appeal the decision that he was permanently and partially disabled to the Civil Service Commission.  (Def.'s Mot. Summ. J., K.)

In an effort, to avoid the legal consequences of his failures, Plaintiff contends that the appeal process is only available for those who wish to disprove the medical finding that they are permanently and partially disabled.  As such, he claims that a individual who agrees that he is disabled has no remedy to prove that despite his disability, he can perform work with an accommodation.  This argument fails in multiple respects. First, Plaintiff completely disregards the initial portions of the procedure, wherein an employee is permitted to meet with the Medical Director, present medical evidence from his own doctor, and either explain why he is not disabled or request more time to fully recover.  Plaintiff fails to offer any "concrete evidence" to show that this process was futile.[16]  Moreover, Plaintiff's challenge to the appellate process again misunderstands the meaning of the term "disabled" as used in Regulation 32.  "Disabled," for purposes of the Regulation, does not mean simply suffering from some sort of medical impairment that inhibits certain activities; rather it means that the employee could not do the essential functions of his position with or without accommodation.  Thus, the determination of "disability" under Regulation

---

[16]  Plaintiff argues that "[w]hile Defendant suggests that Plaintiff failed to participate in the processes available to him, Plaintiff did not intentionally miss his meeting with the Medical Director.  The meeting was scheduled for a time when he was unavailable to attend.  In lieu of making even a superficial attempt at maintaining meaningful process by rescheduling the meeting or contacting Plaintiff, Defendant followed its usual procedure of allowing the Medical Director to make a unilateral decision about Plaintiff's disability status."  (Pl's Resp. Def.'s Mot. Summ. J. 14 n.3.)

This argument is meritless.  The Medical Director clearly notified Plaintiff of his appointment time.  If that time was inconvenient for Plaintiff, the onus fell on him to call to cancel, reschedule, or arrange an alternative way of submitting records.  His absolute silence and unexplained failure to attend did not require the Medical Director to jump through hoops to accommodate an employee who may have simply chosen not to participate.

32 necessarily encompasses consideration of whether an employee could perform the essential functions of his position with or without reasonable accommodation. An employee who agrees with the Medical Director's disability determination would have no basis to appeal. Accordingly, nothing in the appeal process renders it futile.

Given the fact that Plaintiff had sufficient notice and opportunity to contest his separation from his position as a Philadelphia police officer, the Court can find no merit to Plaintiff's procedural due process claim. Defendant is therefore entitled to judgment on this claim.

### F. Conclusion as to Defendant's Motion for Summary Judgment

In sum, the Court concludes that Defendant's Motion for Summary Judgment must be granted in part and denied in part. As to Defendant's attempts to dismiss Counts I and II of the Complaint – claims for discrimination under § 504 of the Rehabilitation Act – a genuine issue of material fact remains regarding the essential functions of Plaintiff's former position. Absent a resolution of that issue by a factfinder, judgment on those claims is not warranted. As to Plaintiff's claims of Regulation 32's facial invalidity and disparate impact, the Court finds that Plaintiff has failed to sustain his burden of demonstrating any genuine issue of fact as to the validity of these claims. Finally, with respect to the due process challenge, Plaintiff may not maintain this claim since the process provided him was adequate and he nonetheless failed to avail himself of it.

## IV. PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Beyond simply opposing Defendant's Motion, Plaintiff seeks summary judgment on all of his claims. Specifically, he asserts that: (1) he is protected under the disabilities statutes and is thus entitled to summary judgment on his claims that Defendant denied his requests for reasonable accommodations and intentionally discriminating against him; (2) Regulation 32 has a disparate impact upon people with disabilities in violation of the ADA; and (3) Regulation 32 violates the

Due Process Clause. Although the Court has, to large extent, already considered and discussed the arguments raised in this Motion and the accompanying briefs, for the sake of clarity, we briefly touch on each of the issues raised by Plaintiff.

First, as to Plaintiff's claim that he is entitled to summary judgment on his accommodation and intentional discrimination claims, this argument fails precisely for the reasons set forth in Section III.A above. Prior to succeeding on any claim for discrimination under § 504 of the Rehabilitation Act, an employee must demonstrate: (1) that he or she has a disability; (2) that he or she is otherwise qualified to perform the essential functions of the job with or without reasonable accommodations by the employer; and (3) that he or she was nonetheless terminated or otherwise prevented from performing the job. Donahue, 224 F.3d at 229 (citations omitted). The sole point of contention between the parties is whether Plaintiff was otherwise qualified to perform the essential functions of the police officer job with or without reasonable accommodations. In order to rule on this issue, the Court must be able to determine the essential functions of the position in question. As set forth in great detail above, however, a genuine issue of material fact remains on that issue. In turn, Plaintiff cannot, at this juncture, conclusively establish the *prima facie* case necessary for a favorable judgment on his claims of disability discrimination.

Second, with respect to Plaintiff's claim that Regulation 32 creates a disparate impact on individuals with disabilities, Plaintiff is likewise not entitled to summary judgment. As set forth above, although Regulation 32 is, in fact, a method of administration which screens out persons with disabilities, it is not a process which screens out persons with disabilities who are entitled to protection under the Rehabilitation Act. In other words, Regulation 32 only allows termination from City employment of individuals with disabilities who are not otherwise qualified to perform the essential functions of their jobs with or without accommodation. Because Plaintiff has failed to

offer any statistical evidence to the contrary, Plaintiff's Motion for Summary Judgment on this issue must be denied.

Finally, as to Plaintiff's contention that Regulation 32 violates the Due Process Clause by failing to provide adequate procedural protections prior to terminating employees, Plaintiff's Motion again fails to meet the requisite burden. Under well-established jurisprudence, Regulation 32's process of providing notice, a meeting with the Medical Director in which the employee may provide his or her own medical evidence, and the opportunity to appeal the ultimate decision is sufficient to satisfy the dictates of the Due Process Clause. Moreover, Plaintiff's failure to engage in that process at all renders him unable to bring a viable due process claim.

## V.     CONCLUSION

For all of the foregoing reasons, the Court will grant Defendant's Motion for Summary Judgment in part and deny it in part. In addition, the Court will deny Plaintiff's Motion for Summary Judgment in its entirety.

An appropriate order follows.